# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

| | | |
|---|---|---|
| WANDRA GILRANE, | ) | |
| | ) | Case No. 1:16-cv-403 |
| *Plaintiff*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Susan K. Lee |
| UNUM LIFE INSURANCE COMPANY | ) | |
| OF AMERICA and UNUM GROUP | ) | |
| CORPORATION, | ) | |
| | ) | |
| *Defendants*. | ) | |

## MEMORANDUM OPINION

Before the Court is Plaintiff's motion for judgment. (Doc. 22.) For the following reasons, the Court **DENIES** Plaintiff's motion for judgment as a matter of law (Doc. 22) and will **ENTER** judgment in favor of Defendants Unum Life Insurance Company of America and Unum Group Corporation.[1]

## I.     BACKGROUND

Plaintiff brought this action pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, to obtain judicial review of Unum's termination of long-term disability benefits. (Doc. 1.) Plaintiff previously worked as a registered nurse with South Lake Hospital ("South Lake") in Florida. (*Id.*) In 2005, Plaintiff began receiving long-term

---

[1] Defendants represent that Unum Life Insurance Company of America issued the insurance coverage funding the ERISA plan at issue herein and Unum Group Corporation provides administrative services for claims made under the plan at issue. (Doc. 23, at 1 n.1.) Accordingly, the Court will refer to Defendants collectively and interchangeably as "Unum."

disability benefits under South Lake's welfare benefit plan (the "Plan")[2] with Unum, due to the effects of chronic inflammatory demyelinating polyneuropathy ("CIDP"), a peripheral nerve disorder which affects sensory function in the limbs and can cause considerable weakness, fatigue, and difficulty manipulating and grasping objects. (Doc. 16-1, at 107–10; Doc. 16-2, at 44–47.) After Plaintiff was diagnosed, she began intravenous immunoglobulin ("IVIG") treatments, a multiple-day procedure whereby she would receive medication directly into her blood stream. (Doc. 16-2, at 30–31.) Plaintiff was also prescribed Neurontin for her pain. (*Id.* at 34.) Over the next ten years, Plaintiff was treated mainly by two physicians, Stephen Rosenberg, M.D., a board certified neurologist, and Memory Crowley, D.O., Plaintiff's primary care physician.

The Plan, a forty-five page document entitled "Summary of Benefits" (Doc. 16-1, at 50–94), provides that Unum "will provide benefits under this Summary of Benefits" and that "Unum makes this promise subject to all of this Summary of Benefits' provisions" (*id.* at 50). The "Glossary" defines "Plan" as "a line of coverage under the Summary of Benefits." (*Id.* at 90.) Pursuant to the "Benefits at a Glance" section, the Plan "provides financial protection for [employees] by paying a portion of [their] income while [they] are disabled." (*Id.* at 52.) The "Certification Section" provides that Unum will make benefit determinations "under the Summary of Benefits." (*Id.* at 61.) Additionally, the "Certification Section" provides that "Unum has discretionary authority to determine [employees'] eligibility for benefits and to interpret the terms and provisions of the Summary of Benefits." (*Id.*) The section that is specific to ERISA, moreover, provides that:

---

[2] The parties dispute that the Plan is a controlling ERISA plan document, which the Court considers *infra* in Part II.

> [T]he Plan Administrator, and any designee (which shall include Unum as a claims fiduciary) will have the broadest discretion permissible under ERISA and any other applicable laws . . . . Benefits under this Plan will be paid only if the Plan Administrator or its designee (including Unum), decides in its discretion that the applicant is entitled to them.

(*Id.* at 87.)

Under the terms of the Plan, an employee is considered disabled and eligible for long-term disability benefits if she is unable to "perform[ ] the material and substantial duties of [her] regular occupation due to [a] sickness or injury" and has a 20% loss of income due to that sickness or injury. (*Id.* at 65 (emphasis omitted).) After Unum pays an employee benefits under the Plan for twenty-four months,[3] that employee is disabled if "due to the same sickness or injury, [she is] unable to perform the duties of any **gainful occupation** for which [she is] reasonably fitted by education, training or experience."[4] (*Id.* (emphasis in original).) Unum specifically reserved the right to conduct a physical examination of an employee claiming a disability under the Plan. (*Id.*)

After Plaintiff was initially diagnosed in 2005, she received weekly IVIG treatments. (Doc. 16-2, at 35.) Shortly after her diagnosis, Dr. Rosenberg noted that Plaintiff had sometimes "quite severe" dysesthetic pain, which was treated with Neurontin, and "considerable fatigue and occasional mental fogginess." (*Id.* at 29.) Moreover, her "endurance [was] extremely poor and she [had] difficulty with ambulation beyond short periods." (*Id.*) Over the next few years, Dr. Rosenberg noted similar symptoms. (*See, e.g.*, Doc. 16-3, at 106.) By 2006, Plaintiff's IVIG treatments were extended to approximately every six weeks. (Doc. 16-2, at 25.) By 2012, and continuing into 2013, Plaintiff had responded so well to the treatments that she was receiving

---

[3] Neither party disputes that Plaintiff received benefits for over twenty-four months. (Doc. 22, at 3–4; Doc. 23, at 10.)

[4] Because neither party disputes that the jobs identified by Unum in its vocational analysis constitute "gainful occupations," a further definition is unnecessary.

IVIG treatments every four to six months.  (Doc. 16-4, at 93, 95, 96, 98.)  In September 2013,

Dr. Rosenberg noted that, two-and-a-half months past her last IVIG treatment, Plaintiff "[was]

doing extremely well" and "still functioning virtually normally."  (*Id.* at 93.)  Her "[m]otor

testing . . . show[ed] normal tone and power" and Dr. Rosenberg could not "even detect minimal

dorsiflexion weakness."  (*Id.* at 93.)  On January 27 and 28, 2014, Plaintiff received an IVIG

treatment.  (Doc. 16-7, at 25–30.)  On April 3, 2014, "just under 2 months from [Plaintiff's] last

IVIG infusion,"[5] Dr. Rosenberg reported that she felt "great."  (Doc. 16-4, at 163.)  Again, her

"[m]otor testing show[ed] normal tone and power throughout, specifically including distal

groups," and Plaintiff was even "remain[ing] active and . . . working in the garden outside."  (*Id.*)

He noted that Plaintiff was taking Gabapentin on an as-needed basis for pain, which would

"significantly increase[ ]" the closer she got to her next IVIG treatment.  (*Id.*)

On August 26, 2014, Unum Extended Duration Unit employee Stephanie Morin

contacted Plaintiff via telephone to conduct an annual routine status check.  (*Id.* at 131–32.)

Plaintiff advised Morin that she was still experiencing pain and neuropathy and that "some days

[were] better than others."  (*Id.* at 131.)  Plaintiff explained that she still "[couldn't] do anything

strenuous" and that "[e]nergy conservation" was a concern, but she required less Neurontin for

pain.  (*Id.*)  She was doing some household chores, which was a "big improvement," and

commented that "[t]his is the best that [she] had ever felt."  (*Id.* at 132.)  However,  Plaintiff

noted "[e]ndurance and strength" as her biggest barriers for returning to work.  (*Id.*)  After the

call, Morin wrote a summary of her conversation with Plaintiff, noting that Plaintiff had

"expressed that this is the best she has ever felt."  (*Id.* at 133.)  Based on this conversation, a

discussion with Director Morgan Tribuno, and a review of recent medical records showing

---

[5] The IVIG treatment records reflect that this office visit was just *over* two months from
Plaintiff's January 2014 infusion.  (*See* Doc. 16-7, at 25–30.)

improvement—including Dr. Rosenberg's September 2013 note—Morin recommended transferring Plaintiff's claim to a disability benefit specialist to determine whether Plaintiff "would have skills [for] light or sedentary occupations." (*Id.*) Tribuno agreed with her recommendation, and Unum assigned the claim to Disability Benefit Specialist Nils Ferm. (*Id.* at 136.)

On September 11, 2014, Unum sent Dr. Rosenberg and Dr. Crowley a questionnaire regarding Plaintiff's condition and work capacity. (*Id.* at 160–61, 169–70.) When asked whether Plaintiff was able to perform full-time work with occasional exertion of up to twenty pounds and occasional standing and walking, Dr. Rosenberg replied "no," because of her "chronic neurologic illness with periodic profound weakness." (*Id.* at 160.) He opined that Plaintiff would never have the capacity to work full-time with those occupational demands because "CIDP is a chronic illness." (*Id.* at 161.) Dr. Crowley submitted similar answers. (*Id.* at 169–70.) On September 29, 2014, Tribuno noted that, although Plaintiff's updated records reported improvement, Plaintiff was having "good days and bad days." (*Id.* at 180.) Because "it [was] unclear if sustainability [was] an issue," he recommended direct observation. (*Id.*)

Unum had surveillance video taken in October 2014, approximately nine months after Plaintiff's last IVIG treatment. (Doc. 16-5, at 60–69; Doc. 17.) On October 6, 2014, the investigator hired by Unum conducted surveillance from approximately 6:00 a.m. to 2:00 p.m. In the video, Plaintiff left her house, drove to her church, and stopped inside for a short period. (*Id.*) Plaintiff then drove to a local hospital where she stayed for approximately an hour and a half. (*Id.*) She then returned home, where she stayed the rest of the day. (*Id.*) The video shows Plaintiff driving without difficulty, walking with a smooth gait, carrying a purse, not using her hands to push off the vehicle while exiting, and showing no external signs of pain, such as

grimaces or hesitancy. (*Id.*) The investigator conducted surveillance the next day during the same time frame, but observed no activity. (*Id.*)

On October 13 and 14, 2014, one week after the surveillance video was taken, Plaintiff received another IVIG treatment. (Doc. 16-7, at 31–37.) Typically, Plaintiff would receive a prescription called Gamunex during her treatments, but, unfortunately, the hospital did not have Gamunex available. (Doc. 16-5, at 109.) Flebogamma was used instead even though Plaintiff had had "problems with other IVIG products in the past," according to Dr. Rosenberg. (*Id.*) Though Plaintiff began to experience symptoms only a month later, Dr. Rosenberg noted in November 2014 that Plaintiff was willing to try Flebogamma again. (*Id.*) However, if Plaintiff continued to experience problems with Flebogamma, Dr. Rosenberg stated that he would "insist" on Gamunex in the future. (*Id.*)

On November 25, 2014, an Unum on-site physician, Dr. Daniel Krell, board certified in family medicine, completed a file review of Plaintiff's claim to address whether Plaintiff had the capacity to work "occupations requiring exertion occasionally up to 20 pounds with a range of frequent to occasional sit[ting], occasional standing/walking, as well as a combination of occasional to frequent bilateral [upper extremity] use for reaching, handling, fingering/keyboard use." (*Id.* at 88–91.) Dr. Krell reviewed notes from Dr. Rosenberg and Dr. Crowley from 2013 and 2014, the surveillance video, and Plaintiff's self-reported symptoms and limitations. (*Id.* at 90.) He concluded that "no document test or physical exam findings" suggest that Plaintiff's condition would preclude full-time work. (*Id.* at 91.) Specifically, he noted that the only abnormal physical exam findings in 2013 and 2014 were "reduced deep tendon reflexes," but that this abnormality would not "preclude sustained performance" of gainful employment. (*Id.*) As for Plaintiff's self-reported symptoms, Dr. Krell noted that "none of these impairments is

documented in the medical records" and could not identify a reason for the discrepancy. He listed the reason for Plaintiff's improvement as "appropriate use of IVIG and related . . . medication (gabapentin)." (*Id.*)

Because Dr. Krell reached a decision that contradicted Plaintiff's treating physicians, his "next step" was to contact her treating physicians to resolve the discrepancy. (*Id.*) Dr. Krell attempted to contact Dr. Rosenberg and Dr. Crowley by telephone on December 3, 2014,[6] then sent letters requesting further notes and documentation of Plaintiff's condition. (*Id.* at 93–94, 97–98.) Dr. Crowley responded that Plaintiff's occupational capacity was "variable as her disease is variable." (*Id.* at 126.) Dr. Rosenberg responded that he considered Plaintiff permanently disabled because, given her gradual worsening of symptoms after an IVIG treatment, Plaintiff would only be able to work two out of every eight weeks. (*Id.* at 104.) Dr. Rosenberg noted that Plaintiff feels "quite good" for two weeks after an IVIG treatment, but then "begins to once again accumulate symptoms [that include] pain that becomes extremely severe, parensthesias, and sensory deficits" that "gradually worsen[ ] until the next course of IVIG is administered." (*Id.* at 103.) He also indicated that the longest Plaintiff had gone between IVIG treatments was three months. (*Id.* at 104.) His attached office notes from his last visit with Plaintiff in November 2014, however, revealed that Plaintiff's "[m]otor testing show[ed] normal tone," and, though he noted "a hint of distal weakness involving the interossei in both hands," it was "subtle at best." (*Id.* at 109) Meanwhile, Defendant received another IVIG treatment on December 8 and 9, 2014. (Doc. 16-7, at 38–43.)

After receiving Dr. Crowley and Dr. Rosenberg's responses, Unum obtained another file review of Plaintiff's claim on December 22, 2014, by Dr. Alan Neuren, board certified in

---

[6] Though the fact that Dr. Krell attempted to contact Plaintiffs' treating physicians by telephone is under dispute, it does not affect the Court's reasoning.

neurology, who reviewed Plaintiff's file, including her treating physicians' responses and updated notes. (Doc. 16-5, at 136–41.) Dr. Neuren also concluded that the medical records did not reflect Plaintiff's reported limitations. (*Id.*) Specifically, her response to the IVIG treatments had been "excellent," and she was only requiring treatments two to three times a year. (*Id.* at 140.) Plaintiff "[had] demonstrated no weakness or only a hint of weakness in interosseous muscles." (*Id.*) Dr. Neuren also noted that the December 2014 response from Dr. Rosenberg "is at variance with his own records" with regard to Plaintiff's IVIG treatments and subsequent symptoms. (*Id.*) On January 8, 2015, after given the hypothetical limitation recommended by Dr. Krell and Dr. Neuren, vocational rehabilitation consultant Carrie Gregor identified three occupations for which Plaintiff was "reasonably fitted by training, education, and experience to perform[:]" (1) triage nurse, (2) school nurse, and (3) office nurse. (*Id.* at 148–52.) On February 3, 2015, Unum reached out to Plaintiff and her husband by telephone to confirm that there were no missing medical records and to inform them of Dr. Krell's and Dr. Neuren's conclusions. (*Id.* at 173, 176.) On the call, Plaintiff's husband indicated that Plaintiff was receiving IVIG treatments every two months and that he would contact Plaintiff's physicians for updated records. (*Id.*) A January 2015 office note from Dr. Crowley was submitted, which noted that Plaintiff had "flared" and was experiencing "severe pain." (*Id.* at 185.) On February 6, 2015, Dr. Rosenberg left Unum a voicemail reiterating his opinion that Plaintiff was permanently disabled. (*Id.* at 192.)

On February 10, 2015, Dr. Krell and Dr. Neuren considered the medical records that Unum obtained since their last review and prepared addenda to their reports. (*Id.* at 193–98; Doc. 16-6, at 1–2.) Both concluded that the new records did not change their opinions. (*Id.*) On February 13, 2015, Unum sent Plaintiff a letter terminating her long-term disability benefits (the

"Initial Claims Decision"). (Doc. 16-6, at 8–13.) In its Initial Claims Decision, Unum described its reasons for terminating benefits and the information it considered. (*Id.*) Plaintiff acknowledges that Unum did not receive the October 2014 or December 2014 treatment records until after it issued the Initial Claims Decision. (Doc. 22, at 21.)

On March 3 and 5, 2015, Plaintiff received an IVIG treatment. (Doc. 16-7, at 44–50.) This time, Plaintiff resumed treatment with Gamunex. (*Id.*) Dr. Rosenberg wrote a letter to Unum on March 4, 2015, to express his disagreement with Unum's decision. (Doc. 16-6, at 23–24.) He explained again that Plaintiff will do "quite well" for approximately two weeks, "followed by a gradual decline with increasing weakness, fatigue, and painful sensory symptomatology," to where Plaintiff can only function "perhaps 2 weeks out of every 8 weeks." (*Id.* at 23.) With regard to the surveillance video, he noted that if Plaintiff was observed within two weeks after an IVIG treatment, it would be a "meaningless observation," given that she functions normally during that period. (*Id.* at 24.) Similarly, in March 2015, Dr. Crowley noted that Plaintiff "feels and functions well for 2 weeks after her IVIG then this condition deteriorates." (Doc. 16-6, at 160.) On March 27, 2015, Dr. Krell and Dr. Neuren reviewed these new records and prepared another addenda to their reports, but did not change their opinions. (Doc. 16-5, at 55–64.)

On June 22, 2015, Plaintiff requested an appeal. (*Id.* at 137–51.) She asserted that her "symptoms increase and decrease with no regularity" and that "[t]here are periods when I can perform basic functions one day and can barely lift myself out of bed in the morning the next." (*Id.* at 139.) Subsequently, on July 20 and 21, 2015, Plaintiff received an IVIG treatment. (Doc. 16-7, at 51–56.) On appeal, Unum had a third physician, Dr. Jaqueline Crawford, board certified in neurology, review Plaintiff's medical file. (Doc. 16-6, at 187–93.) On July 31, 2015, she

concluded that the records on file show improvements in Plaintiff's condition, noting that Plaintiff's "physical examinations in 2013 & 2014 are largely normal," but requested: (1) additional IVIG treatment records because some records indicated she was receiving treatments every two months; and (2) additional pharmacy records to assess whether Plaintiff was experiencing impairing side effects from medications. (*Id.*) After obtaining these items, Dr. Crawford reviewed them and concluded that Plaintiff's reported limitations were not supported by the medical evidence. (Doc. 16-7, at 63–67.) She noted that the pharmacy records showed that Plaintiff had not received "Gabapentin for neuropathic discomfort January–November 2014 and no fills of Vicoprofen in 2014," suggesting "many months without pain of a degree to require prescription medication." (*Id.* at 66.) She also noted that the updated IVIG treatment records did not reflect a treatment every two months as suggested. (*Id.*) She noted that Plaintiff had gone nine months without a IVIG treatment from January to October 2014, and that, although Plaintiff received treatments in October and December 2014, "[those] were with a new brand of IVIG which was determined to be ineffective." (*Id.*) Additionally, "[w]hen [Plaintiff] was placed back on Gamunex in March 2015, she did not require another treatment for more than four months." (*Id.*) Despite her initial concern about side effects from medication, Dr. Crawford noted that the pharmacy records showed such a long interval between refills that the dosage "would not be expected to create impairment in cognitive function." (*Id.* at 67.)

On September 2, 2015, Unum sent Plaintiff a letter informing her that her appeal had been denied and stating the reasons for its decision (the "Appeal Decision"). (*Id.* at 72–82.) The Appeal Decision considered Plaintiff's concerns in her appeal of the Initial Claims Decision about her varying symptoms and that on some days she "can barely lift [herself] out of bed in the morning." (Doc. 16-6, at 139.) It noted in response that Neurontin provides Plaintiff some

relief, according to her own words, and allows her to carry out day-to-day tasks. (Doc. 16-7, at 79.) Additionally, though Plaintiff alleged that, at times, she would supplement Neurontin with Vicoprofen because of the pain (Doc. 16-6, at 139), Unum noted that Plaintiff's pharmacy records "show no fills of Vicoprofen in 2014 and none for the first five months of 2015." (Doc. 16-7, at 79.) In regard to the surveillance video, Unum noted that Plaintiff did not display physical pain indicators, walked with a smooth gait, carried a bag, and did not use her hands to push off the vehicle to exit it. (*Id.* at 77.) Additionally, because the video was taken nine months after an infusion, "[t]his period would have been expected to capture you at your most impaired from CIDP per the description of Dr. Rosenberg." (*Id.*) Unum acknowledged that Plaintiff received IVIG treatments in October and December 2014, just two months apart. (Doc. 16-7, at 77.) But Unum noted that the records reflect that these treatments "were with a new brand of IVIG, which was determined to be ineffective." (*Id.*)

Plaintiff filed the instant action to obtain judicial review of Unum's decision on October 10, 2016. (Doc. 1.) Unum filed the administrative record (the "Administrative Record") on March 31, 2017. (Docs. 16, 17.) On July 3, 2017, Plaintiff filed a motion for judgment as a matter of law. (Doc. 22.) On July 18, 2017, Defendants filed a brief in response. (Doc. 23.) On July 25, 2017, Plaintiff filed her reply brief. (Doc. 24.) This matter is now ripe for review.

## II.    STANDARD OF REVIEW

"When reviewing a denial of benefits under ERISA, a court may consider only the evidence available to the administrator at the time the final decision was made." *McClain v Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir. 2014) (citing *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 618 (6th Cir. 1998)). "Denials of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) are reviewed *de novo* 'unless the benefit plan gives the

administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Id.* (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). If the plan document bestows discretion on the administrator or fiduciary, a benefits denial is reviewed under the arbitrary-and-capricious standard. *Id.* While a plan document need not contain "magic words," the Sixth Circuit "'has consistently required that a plan contain a *clear* grant of discretion' to the administrator or fiduciary before applying the deferential arbitrary and capricious standard." *Frazier v. Life Ins. Co. of N. Am.*, 725 F.3d 560, 566 (6th Cir. 2013) (quoting *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998)).

Unum asserts that, under the terms of the Plan, it is a fiduciary to whom South Lake granted discretion, and, accordingly, the more lenient arbitrary-and-capricious standard applies. Plaintiff argues that Unum is not a fiduciary because no actual plan document in the Administrative Record identifies Unum as a fiduciary. According to Plaintiff, the document by which Unum claims fiduciary authority, *i.e.*, the Plan, is not a plan document, but merely a plan summary. Plaintiff asserts that the Plan cannot be a controlling ERISA plan because it refers to a separate policy. For example, Plaintiff notes that one section of the Plan explains who can modify or cancel "The Summary of Benefits" while another section explains who can modify or cancel "The Policy." (Doc. 16-1, at 58, 59.) Plaintiff relies heavily on the Supreme Court's decision in *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011), to assert that a plan summary cannot confer discretion upon a fiduciary. (Doc. 22, at 18–19.)

Plaintiff misreads the *Amara* decision. In *Amara*, the Supreme Court considered a district court's decision to reform the terms of a pension plan to make it consistent with the plan summary sent out to its recipients. 563 U.S. at 425. The district court found that CIGNA's description of the plan, sent out in an employee newsletter, was incomplete and inaccurate. *Id.* at

431.  The district court then reformed the terms of the plan to accord with CIGNA's summary description.  *Id.* at 432–34.  In concluding that the district court did not have authority to reform the plan under 29 U.S.C. § 1132(a)(1)(B),[7] the Supreme Court noted that "statements [in summary documents] do not themselves constitute the *terms* of the plan for purposes of [§ 1132(a)(1)(B)]."  *Id.* at 438 (emphasis in original).  Accordingly, *Amara* does not stand for the proposition that a plan summary cannot serve as an ERISA plan document.  Instead, *Amara* instructs that where there is a conflict between the language of the plan summary and the plan document, the plan document controls.  The Sixth Circuit has recognized this distinction.  *See, e.g.*, *Engelson v. Unum Life Ins. Co. of Am.*, 723 F.3d 611, 620 (6th Cir. 2013) ("[S]ince *Amara*, . . . [plan summaries] lack controlling effect in the face of plain language to the contrary . . . ."); *Liss v. Fidelity Emp'r Servs. Co.*, 516 F. App'x 468, 473 (6th Cir. 2013) ("*Amara* does not support [the claimant's] argument because there is no conflict between the [plan document] and the [plan summary] in the case at hand."); *Bidwell v. Univ. Med. Ctr., Inc.*, 685 F.3d 613, 620, n.2 (6th Cir. 2012) (concluding that the court need not address *Amara* where there is no conflict between the plan summary and the plan document).  Here, because the Plan is the only purported ERISA plan document in the Administrative Record, a conflict between a plan summary and a plan document does not exist.  As such, *Amara* is inapplicable.

Moreover, the Sixth Circuit has determined that a plan summary "functions as the controlling ERISA plan in the absence of a separate plan document."  *Bd. of Trustees v. Moore*, 800 F.3d 214, 219–21 (6th Cir. 2015); *see also Admin. Comm. of Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan v. Gamboa*, 479 F.3d 538, 544 (8th Cir. 2007) ("Where no other source

---

[7] Section 1132(a)(1)(B) allows a court to enforce the "terms of the plan."

of benefits exists, the summary plan description *is* the formal plan document, regardless of its label.")

Here, the Administrative Record suggests that the Plan is the controlling ERISA plan document. Though entitled "Summary of Benefits," the Plan is approximately forty-five pages long. (Doc. 16-1, at 50–94.) The cover page states that Unum "will provide benefits under this Summary of Benefits" and that "Unum makes this promise subject to all of this Summary of Benefits' provisions." (*Id.* at 50.) The "Benefits at a Glance" section states that "[t]his long term disability plan provides financial protection for you by paying a portion of your income while you are disabled," suggesting that the document is in fact a "long term disability plan." (*Id.* at 52.) The "Certification Section" provides that Unum will make benefit determinations "under the Summary of Benefits . . . ." (*Id.* at 61.) The "Glossary" defines "Plan" as "a line of coverage under the Summary of Benefits."[8] (*Id.* at 90.) These provisions clearly indicate that the Plan is not just a summary description of the terms of the plan, but instead a controlling ERISA plan document.

The Plan clearly discloses Unum's discretionary authority to determine coverage. The "Certification Section" provides that "Unum has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the Summary of Benefits." (*Id.* at 61.) The section that is specific to ERISA, moreover, provides that:

> [T]he Plan Administrator, and any designee (which shall include Unum as a claims fiduciary) will have the broadest discretion permissible under ERISA and any other applicable laws . . . . Benefits under this Plan will be paid only if the

---

[8] As noted by Plaintiff, the Plan refers at times to a separate "Policy." The Sixth Circuit has recognized that "there is no requirement . . . that the terms of an ERISA plan be contained in a single document." *Rinard v. Eastern Co.*, 978 F.2d 265, 268 n.2 (6th Cir. 1992). Moreover, the Administrative Record contains no indication of a conflict between the terms of a separate policy and the Plan that would trigger *Amara*.

> Plan Administrator or its designee (including Unum), decides in its discretion that the applicant is entitled to them.

(*Id.* at 87.)  These provisions are more than sufficient to grant Unum discretion.  *Cf. Frazier*, 725 F.3d at 567 (finding a policy requiring claimants to provide "satisfactory proof" of a disability sufficiently clear to grant discretion).  Accordingly, the correct standard of review is arbitrary and capricious.

The arbitrary-and-capricious standard, sometimes referred to as "abuse of discretion," is one of "extremely deferential review."  *McClain*, 740 F.3d at 1064.  "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious."  *Id.* at 1065 (quoting *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003)).  This standard is not demanding, but neither is it toothless.  *Id.* at 1064.  The Court should review both the quality and quantity of the medical evidence and opinions on both sides of the issue.  *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007).  Ultimately, Plaintiff bears the burden of proving that she is entitled to benefits under the terms of the Plan.  *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 700–01 (6th Cir. 2014).

However, where an insurer both decides whether a claimant is eligible for benefits and pays those benefits, as here, it creates a conflict of interest.  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 114–15 (2008).  The Court should weigh that conflict of interest as a factor in applying the arbitrary-and-capricious standard.  *Id.* at 115.  The Court should determine whether "there is evidence that the conflict in any way influenced the plan administrator's decision."  *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006).

## III. ANALYSIS

Plaintiff argues that Unum's decision to terminate her benefits was arbitrary and capricious. Specifically, she claims Unum: (1) did not adequately address her treating physicians' opinions and her self-reported symptoms; (2) improperly focused on older medical records; (3) did not properly evaluate Plaintiff's abilities when it conducted its vocational analysis; (4) placed improper emphasis on the surveillance video; and (5) allowed its conflict of interest to influence its decision to deny benefits.[9]

### a. Treating Physicians' Opinions and Self-Reported Symptoms

Plaintiff argues that when Unum upheld its termination of Plaintiff's benefits in the Appeal Decision, it did not adequately address "the unpredictability and waxing/waning aspect of her condition which both she and her doctors repeatedly explained to Unum." (Doc. 22, at 15.) Specifically, according to Plaintiff, when Unum concluded that Plaintiff would only have to miss two days of work two to three times a year for IVIG infusions, it failed to consider that Plaintiff would have to miss additional time due to "fatigue and other issues that [Plaintiff] and her doctors explained." (*Id.*) For example, in her June 2015 appeal request, Plaintiff asserted that her "symptoms increase and decrease with no regularity" and that "[t]here are periods when

---

[9] In her reply brief, Plaintiff also argues, for the first time, that: (1) Unum did not address all the reasons listed in Plaintiff's appeal in its appeal decision (Doc. 24, at 10–13); and (2) Unum's reliance on Dr. Crawford's opinion was unfounded because her opinion was unsubstantiated (*id.* at 13–14). To the extent these arguments reply to the arguments in Unum's response brief, the Court will consider them. *See* E.D. Tenn. Local Rule 7.1(c) ("A reply brief . . . shall directly reply to the points and authorities contained in the answering brief.") However, to the extent they attempt to assert new bases for which Unum's decision was arbitrary and capricious, it is well settled that a movant cannot raise new issues for the first time in a reply brief. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008). "[A]rguments raised for the first time in a reply brief are generally not considered because such a practice deprives the non-moving party of its opportunity to address the new arguments." *Cooper v. Shelby Cty.*, No. 07-2283-STA-cgc, 2010 WL 3211677, at *3 n.14 (W.D. Tenn. Aug. 10, 2010) (citing Sixth Circuit cases declining to consider arguments first raised in appellate reply briefs).

I can perform basic functions one day and can barely lift myself out of bed in the morning the next." (Doc. 16-6, at 139.) Dr. Rosenberg wrote a letter to Unum in March 2015, after the Initial Claims Decision, explaining that Plaintiff will do "quite well" for approximately two weeks, "followed by a gradual decline with increasing weakness, fatigue, and painful sensory symptomatology," to where Plaintiff can only function "perhaps 2 weeks out of every 8 weeks." (*Id.* at 23.) Plaintiff argues that Unum failed to consider reports such as these when it concluded she could work full time.

A fiduciary may reject a treating physician's opinion as long as it does not totally ignore the opinion, but instead offers a "reasoned explanation, based on the evidence," for rejecting the opinion. *Balmert v. Reliance Std. Life Ins. Co.*, 601 F.3d 497, 504 (6th Cir. 2010); *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003). Moreover, where a fiduciary rejects a treating physician's opinion that lacks objective support in the medical record, it does not act arbitrarily or capriciously. *Cooper*, 486 F.3d at 167; *see also Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 F. App'x 978, 987 (6th Cir. 2010). With regard to self-reported symptoms, the Sixth Circuit has noted that "these types of subjective complaints are easy to make, but almost impossible to refute." *Yeager v. Reliance Std. Life Ins. Co.*, 88 F.3d 376, 382 (6th Cir. 1996) (internal quotation marks omitted). Where the objective medical evidence does not support a plaintiff's self-reported symptoms, a decision to discredit them is not arbitrary and capricious. *Id.*; *see also Oody v. Kimberly-Clark Pension Plan*, 215 F. App'x 447, 453 (6th Cir. 2007) (finding a decision not arbitrary and capricious where plaintiff "had not submitted sufficient objective medical evidence").

Conversely, Unum's decision to conduct file reviews of Plaintiff's medical records rather than to conduct a physical examination is a factor that the Court should consider in determining

whether Unum acted arbitrarily and capriciously. *Rose v. Hartford Fin. Servs. Grp., Inc.*, 268 F. App'x 444, 450 (6th Cir. 2008). "[W]hether the file reviewers are independent medical examiners or are employees of the [plan fiduciary]" should also be carefully considered. *Cooper*, 486 F.3d at 167. The Court should pay particular attention to the lack of a physical examination where, as here, the right to conduct a physical examination was specifically reserved in the plan and file reviewers made credibility determinations as to the extent of the claimant's symptoms. *Smith v. Continental Cas. Co.*, 450 F.3d 253, 263–64 (6th Cir. 2006); *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295–97 (6th Cir. 2005). However, the Sixth Circuit has not held that failure to conduct a physical examination in these circumstances is *per se* arbitrary and capricious. *See Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006) (noting in dicta that "we continue to believe that plans generally are not obligated to order additional medical tests"). Generally, the Sixth Circuit has found a file-only review arbitrary and capricious where there was significant objective medical data in the record to support a disability or where the reviewer did not adequately consider the record. *See, e.g.*, *Shaw v. AT&T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 550 (6th Cir. 2015) (finding failure to conduct a physical examination supports finding decision arbitrary and capricious where administrator did not explain why it discounted treating physician's findings and claimant complained of chronic pain); *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 554–55 (6th Cir. 2008) (finding a file review inadequate where reviewers did not explain why they disagreed with treating physicians and objective medical records supported the claimant's reported symptoms) *Calvert*, 409 F.3d at 295–97 (finding file review arbitrary where CT scans and x-rays demonstrated abnormalities and the reviewer did not describe the data evaluated); *cf. Rose*, 268 F. App'x at 450–51 (finding administrator's decision to reject treating physicians opinions and self-reported symptoms based

on a file-only review not arbitrary and capricious where record lacked objective medical evidence supporting claimed limitations and video surveillance footage was inconsistent with reported symptoms).

Here, because Unum made credibility determinations as to the extent of Plaintiff's symptoms and rejected her treating physicians' opinions, the Court will closely consider Unum's decision to conduct a file-only review. However, the depth and extent of Unum's review, the lack of objective medical evidence supporting Plaintiff's claimed limitations, the inconsistences within her treating physicians' opinions, and the surveillance footage showing Plaintiff walk and drive without difficulty demonstrate that Unum's termination of benefits was not arbitrary and capricious. First, despite Plaintiff's claim that "Unum did not address the unpredictability and waxing/waning aspect of her condition" (Doc. 22, at 15), the Administrative Record demonstrates that Unum did consider the variability of Plaintiff's disease. For example, in September 2014, before Unum made the decision to terminate benefits, Director Tribuno noted that although Plaintiff's updated records reported improvement, Plaintiff was having "good days and bad days" and stated his concern that "sustainability" was an issue. (Doc. 16-4, at 180.) Instead of terminating benefits at that time, he recommended further action. (*Id.*) Moreover, the Appeal Decision explicitly considered Plaintiff's concerns about her varying symptoms and that on some days she "can barely lift [herself] out of bed in the morning." (Doc. 16-6, at 139.) The Appeal Decision responded that Plaintiff herself reported that Neurontin provides her relief and allows her to carry out day-to-day tasks. (Doc. 16-7, at 79.) Additionally, though Plaintiff alleged that, at times, she would supplement Neurontin with Vicoprofen for pain (Doc. 16-6, at 139), the Appeal Decision noted that Plaintiff's pharmacy records "show no fills of Vicoprofen in 2014 and none for the first five months of 2015." (Doc. 16-7, at 79.) Accordingly, the

Administrative Record reflects that Unum did consider the unpredictability of Plaintiff's symptoms.

In evaluating Plaintiff's claim, Unum obtained a file review from three physicians, all of which independently concluded that Plaintiff was capable of full-time employment. Dr. Krell, the first reviewing physician, reviewed not only Plaintiff's treating physicians' notes and reports, but also Plaintiff's self-reported claims of fatigue and weakness. (Doc. 16-5, at 90–91.) He concluded that "no document test or physical exam findings" suggest that Plaintiff's condition would preclude full-time work. (*Id.* at 91.) Specifically, he noted that the only atypical physical exam findings in 2013 and 2014 were "reduced deep tendon reflexes," but that this would not "preclude sustained performance" of gainful employment. (*Id.*) Because Dr. Krell reached a decision that contradicted Plaintiff's treating physicians, his "next step" was to contact her treating physicians to resolve the discrepancy. (*Id.*) Dr. Krell sent Dr. Rosenberg and Dr. Crowley letters requesting further notes and documentation of Plaintiff's condition. (*Id.* at 93–94, 97–98.) When Plaintiff's treating physicians reiterated their opinions that Plaintiff was unable to work, Unum obtained another file review by Dr. Neuren, who considered the treating physicians' responses and updated notes. (*Id.* at 136–41.) Dr. Neuren also concluded that the medical records did not reflect Plaintiff's reported limitations. (*Id.*) Specifically, Plaintiff "[had] demonstrated no weakness or only a hint of weakness in interosseous muscles." (*Id.* at 140.) When Unum received new medical correspondence from Plaintiff's treating physicians, it did not ignore these reports, but had both Dr. Krell and Dr. Neuren review the records and prepare addenda. (*Id.* at 193–98; Doc. 16-6, at 1–2, 55–64, 122–33.) On appeal, Unum had a third physician, Dr. Crawford, review Plaintiff's medical file. (Doc. 16-6, at 187–93.) She initially withheld a conclusion and requested additional documentation, including IVIG treatment and

pharmacy records.  (*Id.*)  After obtaining and reviewing these items, Dr. Crawford concluded that

Plaintiff's reported limitations were not supported by the medical evidence.  (Doc. 16-7, at 63–

67.)  She noted that the pharmacy records suggested "many months without pain of a degree to

require prescription medication."  (*Id.* at 66.)  She also noted that the updated IVIG treatment

records did not reflect a treatment every two months as Plaintiff and her doctors suggested.  (*Id.*)

Dr. Crawford's request for and subsequent review of additional medical records demonstrates the

thoroughness and carefulness of her review.  Accordingly, the depth of Unum's investigation,

which included file-reviews by three separate physicians who considered both the opinions of the

treating physicians and Plaintiff's self-reported symptoms, weighs in favor of finding that

Unum's decision was not arbitrary and capricious.

Moreover, Plaintiff failed to provide objective medical evidence to support her reported

limitations.  Her treating physicians' reports are largely based on Plaintiff's self-reported

symptoms.  For example, in December 2014, Dr. Rosenberg noted to Dr. Krell that Plaintiff feels

"quite good" for two weeks after an IVIG treatment, but then "begins to once again accumulate

symptoms [that include] pain that becomes extremely severe, parensthesias, and sensory deficits"

that "gradually worsened until the next course of IVIG is administered."  (Doc. 16-5, at 103.)

From these reported symptoms, Dr. Rosenberg concluded that Plaintiff would only be able to

work two out of every eight weeks.  (*Id.* at 104.)  His office notes from his last visit with Plaintiff

in November 2014, however, showed little to no objective evidence of a disability.  He noted

after a physical examination that Plaintiff's "[m]otor testing shows normal tone."  (*Id.* at 109.)

Though he noted "a hint of distal weakness involving the interossei in both hands," it was "subtle

at best."  (*Id.*)  Similarly, in March 2015, Dr. Crowley noted that Plaintiff "feels and functions

well for 2 weeks after her IVIG then this condition deteriorates," but provided no objective medical support. (Doc. 16-6, at 160.)

Additionally, as noted by Unum and its file reviewers, Plaintiff's treating physicians' opinions are internally inconsistent. (*See, e.g.*, Doc. 16-5, at 140.) Though both Dr. Rosenberg and Dr. Crowley concluded that Plaintiff only functions well for two weeks following an IVIG treatment, records show improved strength multiple months after Plaintiff was given an IVIG treatment. For example, a September 2013 evaluation by Dr. Rosenberg where Plaintiff was "approximately two-and-a-half months post IVIG," she "[was] still functioning virtually normally." (Doc. 16-4, at 93.) Her "[m]otor testing . . . show[ed] normal tone and power" and Dr. Rosenberg could not "even detect minimal dorsiflexion weakness . . . ." (Doc. 16-4, at 93.) Further, in April 2014, "just under 2 months from [Plaintiff's] last IVIG infusion," Dr. Rosenberg reported that she felt "great." (*Id.* at 163.) Again, her "[m]otor testing show[ed] normal tone and power throughout, specifically including distal groups," and Plaintiff was even "remain[ing] active and . . . working in the garden outside." (*Id.*) Dr. Rosenberg indicated in December 2014 that the longest Plaintiff had gone between IVIG treatments was three months. (Doc. 16-5, at 104.) However, Plaintiff's IVIG treatment records reflect that from 2012 onward, she was only having IVIG treatments, at most, three times a year and had gone as long as nine months between IVIG treatments in 2014. (Doc. 16-4, at 93, 95, 96, 98; Doc. 16-7, at 25–56.) These inconsistencies weigh in favor of a finding that Unum's decision to reject opinions by Plaintiff's treating physicians was not arbitrary and capricious.

Finally, the video surveillance taken in October 2014, approximately nine months after Plaintiff's last IVIG treatment and one week before her next treatment, further demonstrates that Unum did not arbitrarily and capriciously terminate Plaintiff's benefits. In the video, Plaintiff

carried a purse, did not use her hands to push off the vehicle while exiting, walked with a smooth gait, and showed no external signs of pain, such as grimaces or hesitancy. (Doc. 17.) As noted by Unum and its reviewing physicians, the video was at odds with Plaintiff's treating physicians' opinions. (*See, e.g.*, Doc. 16-7, at 75, 77) Unum noted that, because the video was taken nine months after an infusion, "[t]his period would have been expected to capture you at your most impaired from CIDP per the description of Dr. Rosenberg." (*Id.* at 77.) Accordingly, Unum did not act arbitrarily and capriciously when it concluded, contrary to the opinions of Plaintiff's treating physicians and her self-reported symptoms, that Plaintiff would only have to be absent four to six days a year due to her illness.

### b.    *Improper Focus on Old Records*

Plaintiff argues that the initial reason for her disability—namely, the inconsistency and unpredictability of her symptoms and their accompanying limitations—has not improved since she began to receive long-term disability benefits in 2004. (Doc. 22, at 19–22.) She asserts that Unum improperly focused only on medical records that showed "some clinical improvement from late 2013 to mid-2014," while failing to consider records after August 2014 that showed increased symptoms. (*Id.* at 21–22.) For example, Unum terminated Plaintiff's benefits in February 2015, "a mere 2 weeks before [Plaintiff] had to return to the hospital to get her third IVIG infusion in 5 months." (Doc. 22, at 21.) According to Plaintiff, these later records highlight her lack of improvement and render Unum's decision arbitrary and capricious.

Under arbitrary-and-capricious review, where a fiduciary cancels benefits that it once bestowed upon a participant, "the ultimate question is whether the [fiduciary] had a rational basis for concluding that [the participant] was *not disabled* at the time of the new decision." *Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 F. App'x 978, 984 (6th Cir. 2010) (discussing

*Kramer v. Paul Revere Life Ins. Co.*, 571 F.3d 499, 507 (6th Cir. 2009)).  A rational basis does not necessarily have to be predicated on evidence of improvement; it can also be founded on new information about the participant's condition, such as new medical opinions or employment assessment reports.  *Id.* at 984–85.

Here, Unum had a rational basis for its decision to terminate benefits because it was based on evidence of improvement.  According to the Administrative Record, in 2012 and 2013, Plaintiff was receiving IVIG treatments every four to six months.  (Doc. 16-4, at 93, 95, 96, 98.)  In 2014 and 2015, Plaintiff received IVIG treatments on January 27–28, 2014; October 13–14, 2014 (approximately nine months later); December 8–9, 2014 (approximately two months later); March 3 & 5, 2015 (approximately three months later); and July 20–21, 2015 (approximately four months later).  (Doc. 16-7, at 25–56.)  Plaintiff acknowledges that Unum did not receive the October 2014, December 2014, or March 2015 IVIG treatment records until after it issued the Initial Claims Decision.  (Doc. 22, at 21.)  Accordingly, Unum's Initial Claims Decision was reasonably predicated on:  (1) medical records showing an improvement in symptoms and that Plaintiff was receiving IVIG treatment every four to six months; (2) file reviews done by two separate physicians; (3) a lack of objective medical evidence to support Plaintiff's claimed limitations; and (4) the surveillance video showing Plaintiff walking with a normal gait and driving without difficulty nine months after an IVIG treatment.  (*See* Doc. 16-6, at 9–10.)  Unum received the updated records Plaintiff asserts show regression after its Initial Claims Decision.

Unum considered the updated IVIG records in its Appeal Decision and reasonably concluded that Plaintiff was not disabled.  Unum acknowledged that Plaintiff received IVIG treatments in October and December 2014, just two months apart.  (Doc. 16-7, at 77.)  But Unum noted that the records reflect that these treatments "were with a new brand of IVIG, which was

determined to be ineffective." (*Id.*) Plaintiff had had "problems with other IVIG products in the past," according to Dr. Rosenberg, but the hospital pharmacist did not have Gamunex available at the October 2014 IVIG treatment. (Doc. 16-5, at 109.) Flebogamma was used instead. (*Id.*) Though Plaintiff began to experience some symptoms only a month later, Plaintiff was willing to try Flebogamma again in December 2014. (*Id.*) Her IVIG treatments returned to Gamunex in March 2015. (Doc. 16-7, at 45.) Subsequently, Plaintiff did not require another IVIG treatment for more than four months. (*Id.* at 51–56.) Given the longer intervals between IVIG treatments where Gamunex was used, both before and after her October and December 2014 IVIG treatments, Unum had a rational basis to conclude that the two-month interval between the October and December 2014 IVIG treatments was not typical. Ultimately, even considering the short interval between her October and December 2014 treatments, Plaintiff did not require more than three IVIG treatments a year since 2012. Accordingly, Unum considered Plaintiff's later medical records and reasonably concluded that Plaintiff was not disabled at the time of its new decision.

### c. *Vocational Abilities*

Plaintiff argues that Unum did not properly evaluate her ability to sustain work activity because the hypothetical provided to the vocational analyst "came from the non-examining physicians employed by Unum" and did not consider the unpredictability of her condition that both Plaintiff and her treating physicians insisted upon. (Doc. 22, at 22–24.) Additionally, Plaintiff asserts that Unum "did not address how 11 years out of the workforce would impact [Plaintiff]," such as her inability to use newer forms of technology. (*Id.* at 23–24.)

The Court has already concluded that Unum's rejection of the opinions of Plaintiff's treating physicians and reliance on its own physicians' file reviews was not arbitrary and

capricious.  Accordingly, it was entitled to use the hypothetical limitations that its file reviewers provided.  In regard to Plaintiff's eleven-year absence from the workforce, her argument is without merit.  The Sixth Circuit has explicitly held that "a plan administrator is not required to obtain vocational evidence where the medical evidence contained in the record provides substantial support for a finding that the claimant is not totally and permanently disabled." *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 662–63 (6th Cir. 2013).  Because Unum was not required to obtain a vocational analysis, the vocational analyses it did obtain further demonstrate that its decision to terminate benefits was not arbitrary and capricious.  Moreover, Plaintiff bears the burden of showing either that her physical limitations would prevent her from performing the three occupations Gregor identified, *i.e.*, triage nurse, school nurse, and office nurse, "or that those jobs require skills that [s]he could not reasonably acquire at [her] age and experience level."  *Leppert v. Liberty Life Assurance Co. of Boston*, 661 F. App'x 425, 439 (6th Cir. 2016). The Court has already concluded that the Administrative Record lacks objective medical evidence of Plaintiff's reported limitations, and Plaintiff has failed to show that these occupations require skills that she could not reasonably acquire with some training.

> ### d.    *Surveillance Video*

Plaintiff next argues that Unum arbitrarily and capriciously relied on a three-minute surveillance video in its decision to terminate benefits.  (Doc. 22, at 24–25.)  According to Plaintiff, it is arbitrary and capricious to extrapolate three minutes of activity into a full-time work capacity, especially given that the surveillance video did not show Plaintiff engaging in work-related activity.  (*Id.*)

In a decision to terminate benefits, a plan fiduciary may not rely solely on surveillance video that is not necessarily inconsistent with a claimant's reported disability.  *See Kramer v.*

*Paul Revere Life Ins. Co.*, 571 F.3d 499, 505–07 (6th Cir. 2009) (finding a termination of benefits arbitrary and capricious that relied on an hour-long video of claimant helping on a boat where there was a "veritable mountain of contrary medical evidence of [the claimant's disability"). "While [a] surveillance video may not, by itself, prove that [a claimant] is capable of working forty hours a week," Plaintiff still bears the burden of presenting evidence that she is disabled from any gainful occupation. *Rose*, 268 F. App'x at 452 (rejecting a claimant's argument that the plan administrator put too much emphasis on a surveillance video where the claimant offered little objective evidence of her disability).

Here, given the lack of objective medical evidence demonstrating Plaintiff's reported disability, Unum did not act arbitrarily and capriciously in considering the surveillance video. Despite Plaintiff's argument, the video was just one factor of many that Unum relied upon in terminating her benefits. In Dr. Krell's initial review, for instance, though he considered the surveillance video, he did not specifically mention the surveillance video as a basis for his conclusion that Plaintiff was not disabled. (Doc. 16-5, at 90–91.) Moreover, it was not necessarily the amount of activity Plaintiff displayed on the video that weighed in Unum's decision, but the *timing*. The surveillance video was taken approximately nine months after Plaintiff's last IVIG treatment and one week before her next IVIG treatment. The Appeal Decision noted that in the video, Plaintiff did not display physical pain indicators, walked with a smooth gait, carried a bag, and did not use her hands to push off the vehicle to exit it. (Doc. 16-7, at 77.) As Unum noted, "[t]his period would have been expected to capture you at your most impaired from CIDP per the description of Dr. Rosenberg." (*Id.*) Accordingly, because Unum did not rely solely on the surveillance video and Plaintiff failed to provide objective medical

evidence of her disability, Unum's decision to terminate benefits was not arbitrary and capricious.

### e.  *Conflict of Interest*

Finally, Plaintiff argues that Unum demonstrated its conflict of interest when:  (1) Director Tribuno "cherry-picked" Plaintiff's comments about her improvement in an August 2014 call; (2) it failed to consider Plaintiff's reported symptoms; (3) it ignored both Plaintiff and her treating physicians reports about "fatigue, the need to rest, and to conserve energy" when it concluded that Plaintiff would only require four to six days absence per year for IVIG treatments; and (4) it concluded that Plaintiff was not restricted based on the video surveillance footage when the footage was consistent with Plaintiff's reported symptoms.  (Doc. 22, at 25–26.)  As already noted, because Unum both decides whether a claimant is eligible for benefits and pays those benefits, it has a conflict of interest that the Court should weigh as a factor in applying the arbitrary-and-capricious standard.  *Metro. Life*, 554 U.S. at 114–15.  A conflict of interest, however, "prove[s] less important . . . where the administrator has taken active steps to reduce potential bias and promote accuracy."  *Id.* at 117.

The Court has already considered Plaintiff's last three arguments and concluded that Unum did not act arbitrarily and capriciously.  With regard to Plaintiff's argument that Director Tribuno "cherry-picked" her comments about her improvement in August 2014, the Administrative Record suggests otherwise.  Though Morin's note on August 27, 2014, stated that Plaintiff had "expressed that this is the best she has ever felt" (Doc. 16-4, at 133), Tribuno noted about a month later that Plaintiff reported she "has good days and bad days" and specifically worried whether "sustainability [was] an issue" (*id.* at 180).  Based on these concerns, Unum did not terminate benefits at that time, but recommended direct observation.  (*Id.*)  Accordingly, even

considering Unum's conflict of interest, its decision to terminate Plaintiff's benefits was not arbitrary and capricious.

**IV.     CONCLUSION**

For the foregoing reasons, the Court **DENIES** Plaintiff's motion for judgment (Doc. 22) and will **ENTER** judgment in favor of Unum.

**AN APPROPRIATE JUDGMENT WILL ENTER.**

*/s/ Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**